**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | Case No. 19 CR 641 |
| v. | Magistrate Judge Sunil R. Harjani |
| MARQUEL RUSSELL a/k/a/ "P," "Will Panero," et al. | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on the government's motion to detain the defendant, Marquel Russell, pending trial on a charge of conspiracy to violate 18 U.S.C. § 1962(c) through a pattern of racketeering activity. This matter also raises a novel question in this Circuit as to when a court should request the production of a live witness at a detention hearing, as opposed to accepting a proffer, in considering the government's motion for detention. For the reasons stated below, the Court asked for a live witness on this matter, considered the evidence offered by both the government and the defendant, and now grants the government's motion for pretrial detention pursuant to 18 U.S.C. §3142(g).

**Background**

Russell is accused of overseeing, directing, guiding, and participating in the illegal activities of an enterprise through, among other things, acts involving murder and robbery, the illegal trafficking of controlled substances, and the illegal possession and trafficking of firearms in violation of Title 18, United States Code, Section 1962(c). Doc. [284] at 5-6.

A grand jury returned an indictment on the aforementioned charge on October 28, 2021 against Russell and twelve co-defendants. Russell was arrested on October 29, 2021, and the Court

held an initial appearance and arraignment that day. The government moved for detention and requested a detention hearing under 18 U.S.C. § 3142(f)(1)(A). Without objection from defendant, the Court scheduled and held a detention hearing on November 5, 2021 by videoconferencing, and continued it to an in-person hearing on November 9, 2021. The government asserted its basis for pretrial detention was that Russell is a flight risk and a danger to the community. During the first day of the detention hearing, after listening to the government's argument in support of detention, the Court requested a witness to testify to the facts proffered by the government. As a result, Special Agent Paul Daou from the Bureau of Alcohol, Tobacco, Firearms and Explosives, who is the case agent in the investigation, testified on November 9, 2021.

At the hearing, based on the allegations of the indictment and testimony from Special Agent Daou, the government argued that Russell is one of the leaders of a violent section of the Traveling Vice Lords gang, named the Wicked Town faction, that is charged with conducting murders, attempted murders, armed robberies, and drug trafficking over the course of twenty years (hereinafter "Wicked Town Enterprise"). Special Agent Daou testified that evidence gathered in the investigation showed that that Russell was a founding member of the faction and also groomed admission of younger generations into the faction through a violent initiation process.

Among other acts, the government alleged that Russell participated in significant narcotics trafficking in an area of the City of Chicago that is specifically controlled by the Wicked Town Enterprise—near the 500 block of North Leamington Avenue. Related to that allegation, the government cited a drug conviction on May 7, 2001 in Russell's criminal history. While Russell pled guilty to a possession of narcotics charge, the government argued that the underlying arrest, based on an arrest report provided to the Court, was for distribution of narcotics in the 500 block of North Leamington Avenue in September 2000. The government argued this provided further

2

evidence that Russell was distributing narcotics, as part of the Wicked Town Enterprise, because the gang controls narcotics trafficking in that area. Similarly, based on the Pretrial Services Report, the government contended that Russell was sentenced in two separate cases in 2009 and ordered to serve a sentence of six years' and three years' imprisonment respectively. The first charge occurred in April 2009, and in that case, Russell pled guilty to possession of less than 100 grams of heroin. In the second case, in May 2009, Russell was charged with manufacture, delivery, or possession with intent to deliver a controlled substance, but ultimately, he pled guilty to, and was convicted of, possession of a controlled substance. Special Agent Daou testified that Russell's narcotics possession in one of the incidents occurred at 502 North Leamington, the area controlled by the Wicked Town gang.

Next, the government highlighted Russell's 2019 firearm conviction that resulted in a three-year sentence of incarceration. This conviction occurred subsequent to a 2017 execution of a search warrant at Russell's residence. Doc. [345]. During that search, law enforcement seized loaded Taurus and Glock firearms, ammunition, and five bags of suspected heroin, all of which were stored in a larger plastic bag. As a result, Russell was charged in an eight-count indictment with an Armed Habitual Criminal offense, several additional firearms offenses, and a drug trafficking offense. However, he was convicted only on the charge of unlawful possession of a firearm, and received a sentence of three years' imprisonment.

The government also identified other risk factors for the Court to consider, such as Russell's history of bond forfeitures, and the fact that he was charged with a new drug crime while on bond for a pending drug case. Specifically, the government pointed to the Pretrial Services Report showing that his May 2009 arrest occurred while he was released on bond for his April 2009 arrest.

3

At the hearing, the government presented two audio recordings and a video clip during the testimony of Special Agent Daou. The video depicted the attempted murder of an individual by three men at the scene of the crime; this attempted murder is alleged in the superseding indictment as part of the conspiracy. Doc. [284] at ¶8(o)(vii). The government argued that Russell was the driver of the getaway vehicle that appeared in the video, although the video did not depict his face. The government based this claim of Russell's involvement on information from a cooperating witness who was present for the shooting, and whose information was detailed through Special Agent Daou. Further, the government corroborated the cooperating witness's testimony with a document from the Illinois Secretary of State's Office showing that a vehicle similar to the vehicle that appeared in the video was registered to Russell. The government added that Special Agent Daou testified that other witnesses had also previously identified Russell as the owner of the getaway vehicle, although they were not specified by name.

The audio recordings, which were derived from wiretap evidence relating to the charges in the indictment, revealed two individuals discussing an immediate need for ammunition for a gun. The government argued that the voice of the person requesting the ammunition in the audio recording was Russell's voice. The government based this claim on the Special Agent's testimony, who compared the voice on previously recorded calls during the investigation with Russell's voice during the custodial interview he conducted of him after his 2021 arrest. In addition, while no arrests were made, law enforcement agents surveilled and stopped a vehicle as a result of information provided in the calls. Officers found Russell driving the vehicle and a co-defendant, Deshon George, with a firearm in his coat pocket, which was seized. Subsequent to that stop, Special Agent Daou testified, based on a wiretap call introduced during the hearing, that Russell and George discussed the incident and seizure.

Finally, the government argued that items found during Russell's arrest on October 29, 2021 was the most persuasive evidence of his ongoing involvement in drug trafficking. The government executed a search warrant of Russell's home on the day of his arrest. Special Agent Daou testified that agents discovered a bag with in excess of 50 grams of a substance suspected to be crack cocaine in Russell's room. During his arrest, Russell was observed kicking the bag in an attempt to move it away from plain sight. A picture of that bag was introduced at the hearing. Subsequently, Russell verbally acknowledged to law enforcement that the bag with the substance belonged to him. Furthermore, Special Agent Daou testified that federal agents also found scales, baggies, and mail addressed to Russell in his room.

Russell's counsel did not call any witnesses at the hearing, but argued for release based on information in the Pretrial Services Report, information obtained from the testimony of Special Agent Daou, and information provided to the Court by proffer. In arguing for release pending trial, Russell's counsel stated that Russell's predicament is distinct from other defendants charged in the superseding indictment because Russell was not charged with murder in any count, and because the statutory maximum he faces is twenty years' imprisonment as opposed to a life sentence. Further, his counsel argued that the only violent act charged in the indictment specifically is an attempted murder, as part of the racketeering conspiracy charge. Based on his cross-examination of Special Agent Dao, Russell's counsel expressed skepticism about the government's proof that Russell was at the scene of that crime. He argued that there was a legitimate question about whether Russell was present because the video did not depict who was in the driver's seat of the vehicle, nor the license plate of the vehicle. Russell's counsel also questioned the credibility of the cooperating witnesses who identified Russell as a leader of the

Wicked Town Enterprise, because those witnesses were seeking leniency in their own cases or some other reward in exchange for their cooperation.

Next, Russell's counsel discussed the timeline of Russell's criminal history. He highlighted that most of Russell's convictions were old. For example, one of Russell's possession of narcotics convictions happened twenty-six years ago, his misdemeanor gun charge was from twenty-seven years ago, the 2000 drug possession case occurred twenty-one years ago, and the 2009 cases occurred twelve years ago. Russell's counsel emphasized that the 2009 cases, where Russell was convicted and served concurrent sentences, were for the possession of drugs and not for narcotics trafficking. Russell's counsel also discussed the bond forfeiture warrants against Russell. He noted that they occurred decades ago, and that many concerned minor charges like disorderly conduct and a misdemeanor battery.

Moreover, defense counsel discussed Russell's personal history, based on the Pretrial Services Report and by proffer. He stated that Russell is a 44-year-old man who is a lifelong resident of Chicago and who does not possess a United States passport. Russell's mother and sister are present figures in his life, and he has nine children between the ages of thirteen and twenty-nine, eight of whom live in Chicago. Defense counsel also noted that Russell has a GED and that he worked as a medical transport driver prior to the 2020 pandemic.

 Further, according to Russell's counsel, Russell is on disability because he suffers from a serious heart condition, diabetes, and high blood pressure. Russell has also had two kidney transplants, and, as a result, he is administered a daily injection. Russell has a bullet lodged in his spine that affects his mobility, and he was confined to a wheelchair for several years after he was shot in his spine. Furthermore, Russell has a scheduled MRI on December 20, 2021 for nodules that have been discovered in his lungs. Finally, Ms. Ladazha Jackson, the mother of Russell's

granddaughter, was present at the hearing and told the Court of her willingness to act as a third-party custodian and a co-signer on a bond for Russell. Ms. Jackson commented that she has known Russell for eight years. She was willing to allow Russell to live in her home, confirmed that there were no weapons there, and that she would have no objection to location monitoring if it is ordered by the Court. Finally, Russell's counsel proposed release under the most stringent possible home confinement condition with location monitoring. At the conclusion of the hearing, the Court took the matter under advisement. The government has since provided evidence, in the form of a Cook County record, that Russell's 2000 conviction was indeed for narcotics trafficking and not simple possession. Doc. [345]

### Discussion

As a general matter, detention pending trial is warranted only if a court finds that no condition or combination of conditions will reasonably assure the appearance of the person as required or the safety of any other person and the community. 18 U.S.C. § 3142(e)(1); *United States v. Portes*, 786 F.2d 758, 760 (7th Cir. 1985); *United States v. Wilks,* 15 F.4th 842, 846 (7th Cir. 2021). Furthermore, in assessing a defendant's risk of flight, the government bears the burden of proof to demonstrate flight by a preponderance of the evidence. *See Portes,* 786 F.2d at 765. In considering whether a defendant poses a threat of danger to the community, the government bears the burden of proof by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B); *see United States v. Salerno,* 481 U.S. 739, 751 (1987).

**A.     The Court's Request for a Live Witness at the Detention Hearing**

During the first day of the detention hearing, it became apparent to the Court that the government intended to proffer a substantial amount of information that was not contained in either the indictment or in the Pretrial Services Report. At that point, the Court requested the government

provide a live witness to testify to that information, and the government complied, leading to a second day of detention hearing.

The Seventh Circuit has not laid down any principles as to when a district or magistrate judge should request a live witness, versus a proffer of witness testimony, at a detention hearing. A proffer is essentially counsel's recitation of what witnesses would testify to if called to the stand. Proffers, in the detention hearing context, proceed more as summaries – either about evidence supporting the charged incident (as recounted by the government), or the defendant's personal circumstances (as recounted by defendant's counsel). Section 3142(f) only notes a defendant's ability to proceed by proffer, and does not mention the method by which the government may proceed. *See* 18 U.S.C. § 3142(f)(2). However, courts have also extended the ability to present information by proffer to the government, *See e.g. United States v. Smith,* 79 F.3d 1208, 1210 (D.C. Cir. 1996); *United States v. Winsor*, 785 F.2d 755 (9th Cir. 1986). Often in this district, the government and the defense stipulate on the record to proceed by proffer, or no objection is launched by either party. *See e.g. United States v. Smiekel*, 11 M 20, 2011 WL 3555808 (N.D. Ill. Aug. 11, 2011). The defendant also retains the right to counsel, to testify, to call witnesses, and to cross-examine the government's witnesses. 18 U.S.C. § 3142(f)(2); *Portes*, 786 F.2d at 767. However, it is also generally recognized that a district court has the discretion to request a live witness, if it so desires, rather than rely solely on a proffer. *See e.g., United Sates v. Gabiria,* 828 F.2d 667, 669 (11th Cir. 1987); *United States v. Delker*, 757 F.2d 1390, 1395-96 (3d Cir. 1985), *United States v. Thomas,* 15-249, 2016 WL 890583 (W.D. Pa. Mar. 9, 2016); *United States v. Aguedo*, No. 15 CR 115, 2015 WL 6445742, *2 (M.D. Fl. Oct. 23, 2015); *United States v. Muse*, 14-2007, 2014 WL 495121, at *1 (D.N.J. Feb. 6, 2014); *United States v Hammond*, 44 F.Supp.2d 743, 745 (D. Md. 1999). The balance there is to ensure that the detention hearing does not become

a full-blown trial, while weighing the need to properly evaluate evidence that may deprive an individual of his liberty, prior to any adjudication on the charged offense, for a significant period of time.

In considering how to proceed, the Court acknowledges that the Supreme Court has recognized the seriousness of pretrial detention. In *United States v. Salerno*, 481 U.S. 739, 755 (1987), the Supreme Court stated: "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception. We hold that the provisions for pretrial detention in the Bail Reform Act of 1984 fall within that carefully limited exception. The Act authorizes the detention prior to trial of arrestees charged with serious felonies who are found after an adversary hearing to pose a threat to the safety of individuals or to the community which no condition of release can dispel." Key in this analysis is the recognition that pretrial detention is the exception, rather than the norm, and that an adversary hearing is the mechanism by which to make that determination.

Recognizing the "exceptional step" that is pretrial detention, the Seventh Circuit has acknowledged the need for a court to appropriately weigh evidence given the seriousness of the decision. *See United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991). In favoring witness testimony at a detention hearing, under different circumstances than those presented here, the Seventh Circuit commented: "Counsel's summary is not evidence. Summaries are sterile. Offers of proof are but a shadow of testimony." *Id.*

In further considering this issue, the Court notes that the burden of proof at a detention hearing is no small matter. The government must prove by a preponderance of evidence that the defendant is a flight risk, and by clear and convincing evidence that the defendant is a danger to the community. 18 U.S.C. § 3142(f); *Portes*, 786 F.2d at 765. Preponderance of the evidence, of

course, is the standard of proof used in civil cases, and often results in a finding after a full trial on the merits involving witnesses, documents, and even expert testimony. Clear and convincing evidence is an even higher burden of proof. Considering the standards of proof required to find that pretrial detention is warranted, it is appropriate for a court to consider the form in which evidence is presented, or whether a proffer (which is not evidence) will suffice.

The issue then is under what circumstances is it appropriate for a court to request live witnesses rather than accept a proffer. Ordinarily, the parties rely upon a pretrial services report, and there is often no dispute as to the information in that report because it is a combination of a defendant's reported criminal history as well as information obtained from the defendant himself and his family. The parties often rely upon a sworn affidavit attached to a criminal complaint or search warrant application in arguing the nature and circumstances of the offense, and that has an indicia of reliability as it is a statement under oath. Similarly, an indictment, to the extent it involves details of the offense, is often a source to which a court can look to as the indictment contains facts presented to a grand jury upon which it made a finding of probable cause to return that indictment. However, there are circumstances when an affidavit was not filed in a case, or when the indictment states only the charging language of the statute without detail. The court is then left with the prosecutor's oral proffer of the details of the offense. Additional government assertions can include, for example, post-arrest statements, dangerous items found during the execution of a search warrant, evidence of flight from arrest, or specific acts of violent conduct that occurred during the investigation. And while a prosecutor is always under an obligation to truthfully describe the circumstances of criminal conduct, it is hard to envision a scenario where a prosecutor, in seeking detention, would concede the weight of the evidence is weak, or where a prosecutor would point out significant evidentiary gaps in a criminal incident. It is also hard to

conceive how a defendant would seek to challenge the government's oral proffer about these facts at the very beginning of a criminal case, before discovery has even commenced. The stakes are even higher when the government offers uncharged conduct in support of its request for detention, which it is permitted to do. *See e.g. United States v. Gaston*, 21 CR 36, 2021 WL 1170201, at *5 (N.D. Ill. Mar. 25, 2021). A court, left with only a government's proffer, has almost no mechanism to evaluate the reliability of the uncharged conduct provided by the government.

As a result, the Court finds that it is most appropriate to exercise its discretion and request a live witness in the following scenario: (1) where the government relies upon a description of criminal conduct (charged or uncharged) in which there is no detailed indictment or affidavit describing those facts; and (2) where the conduct, charged or uncharged, will constitute a substantial basis for the court's decision to find that the government has met its burden of proof. In these circumstances, a live witness will allow a court to properly assess the reliability of information as the testimony will be under oath, and will no doubt be sufficiently detailed as to the source and nature of the evidence to allow meaningful evaluation. It will also allow the court to assess credibility, as the court can observe the witness and make determinations on this matter. It is likely that exhibits will be presented (such as documents, video, or audio recordings) with the witness's testimony, which will provide context to those exhibits and allow the court to better view the quality of evidence that is offered in support of detention. It also provides a level of due process to a defendant faced with contesting those assertions by allowing the opportunity for cross-examination. *See United States v. Jordan*, 742 F.3d 276, 280 (7th Cir. 2014) (stating, in the context of revocation hearings: "Where, as here, a person's liberty is at stake, the opportunity to confront witnesses and reveal problems with their testimony is an important component of due process.") Courts in other circuits have raised similar concerns as those expressed here, and similarly

11

Case: 1:19-cr-00641 Document #: 363 Filed: 11/22/21 Page 12 of 20 PageID #:1228


requested the testimony of a live witness at a detention hearing. *See e.g. United States v Cooper*, BE-08-0239, 2008 WL 2331051, at *2 (D. Md. Jun. 16, 2008); *Hammond*, 44 F.Supp.2d at 746.

It appears to the Court that the production of a live witness, in circumstances where it is warranted, is a very small burden given the gravity of the decision before the Court, which is to predict whether a defendant will flee or commit another crime if released. The procedural safeguards in place in deciding whether an individual is guilty of a crime and should be sentenced to prison far exceeds those at a detention hearing. But the decision at a detention hearing can be almost impactful as at sentencing, because both can lead to a significant period of incarceration. Thus, while the government may be concerned that a preliminary hearing, such as a detention hearing, will be used as a vehicle for discovery, and defendant's counsel admittedly do sometimes use those hearings to push the boundaries during a witness examination, those concerns are not sufficient to thwart the occasional need for a live witness. Indeed, it is the duty of the Court to both make an informed decision on detention, and also to ensure that the proceedings involving a detention hearing are focused to the issue at hand.

It is, however, important to recognize that this exercise of court discretion still provides significant flexibility to the government. As recognized in Section 3142(f), the rules of evidence do not apply to a detention hearing, and thus hearsay can be considered. *Portes*, 786 F.2d at 767. Indeed, much of the testimony of a live witness, who is often a law enforcement agent, is hearsay at pretrial hearings, as the testimony may recount statements of witnesses, description of wiretap calls or consensual recordings, surveillance conducted by other agents, or transactions engaged in by cooperating sources. All this hearsay, provided through one law enforcement agent's testimony, is an acceptable source at a detention hearing. *See United States v. Calabrese*, 436 F.Supp.2d 925, 926 (N.D. Ill. 2006) ("In practical terms, this allows the prosecution to prove what

its witnesses would say by offering the testimony of an investigator who tells the court what the witnesses have reported to him. This type of hearsay is heard routinely by grand juries and at preliminary hearings."). Although, the government cannot abuse this option such that an agent with little to no knowledge of key aspects of the investigation is sent over to testify before a court. *See Cooper*, 2008 WL 2331051, at * 2 (where the defendant's alleged confession was a key factor in detention hearing, agent who was not present during the confession and had limited involvement in the case did not suffice). The government also need only introduce facts upon which it is using to advocate for detention, and the defendant's cross-examination will be limited to the scope of that testimony, so as to avoid the use of the hearing as a means by a defendant to conduct discovery.

Proffers provide great expediency at detention hearings, both for the government in presenting information in summary form without a protracted hearing involving witness examinations prior to trial, and for the defendant, who has a right to not testify but who is often the only source of information about his personal circumstances and the incident prior to the production of discovery. Yet, the need for expediency cannot outweigh the significant consequences that result from that hearing, which is a decision that an individual who has been charged solely based on a finding of probable cause may have his liberty suspended for several months or even years while awaiting trial. The loss of liberty often means the end of a defendant's employment, discontinuation of medical care, separation from family and an inability to care and financially support them, and barriers in preparing for a criminal trial, among other things, usually without any notice or time to prepare for this removal from daily life. While courts have considered that pretrial detention is limited in time by the Speedy Trial Act, *see Smith*, 79 F.3d at 1210, the practice of excluding time under the Speedy Trial Act, unopposed, and often up to the moment of trial, often results in a clock that never starts. The stakes are too high to dispense with

a proper evaluation of the reliability of evidence, when necessary, that support a request for detention. The need for careful evaluation of evidence is even more necessary when one considers the preference in the Bail Reform Act in favor of release for defendants prior to trial, the significant burdens of proof associated with the detention motion, and that only when *no* conditions of confinement can reasonably assure the appearance of the defendant or the safety of the community may detention be ordered.

Here, the court learned at the first day of the detention hearing that the government would rely on items found during a search of defendant's residence and evidence of an attempted murder not sufficiently detailed in the indictment, among other items. Upon review of defendant's Pretrial Services Report, the Court determined that defendant's criminal history, along with his background information in the Pretrial Services Report, did not overwhelmingly weigh in favor of detention. The superseding indictment also did not provide the Court with sufficient detail about the nature of the offense. Accordingly, with the above principles in mind, the Court exercised its discretion and requested a live witness to testify to the government's proffered facts, under oath, and subject to cross-examination. That hearing occurred on November 9, 2021 and the evidence adduced from that hearing is now considered in evaluating the government's motion for detention, as further discussed below

**B.     Assessment of Defendant's Risk of Flight and Danger to the Community**

To determine if Russell is a risk of flight and/or a danger to the community, the Court considers: (1) the nature and circumstances of the offenses with which Russell is charged; (2) the weight of the evidence against Russell; (3) Russell's history and characteristics; and (4) any danger Russell poses to the community. 18 U.S.C. § 3142(g).

### 1.    The nature and circumstances of Russell's alleged offenses

Russell is charged in a superseding indictment with twelve other co-defendants for his involvement in wide-ranging racketeering activity.  Russell is alleged to be a leader of the Wicked Town Enterprise, and that in his leadership role, he oversaw, directed, guided, and participated in the illegal activities of the enterprise, involving murder, robbery, the illegal trafficking of controlled substances, and the illegal possession and trafficking of firearms.  The allegations depict an organization that threatens the safety of individuals and are among the most serious crimes that can destroy a community.  Russell's alleged involvement as a leader of a violent gang that terrorizes the west side of Chicago demonstrates that he poses a significant danger to others.  While recognizing Russell's presumption of innocence, the very nature of the charge against Russell is one worthy of pretrial detention.

Furthermore, the government has provided additional details of crimes purportedly committed by Russell.  First, the government presented two audio calls, made during the investigation, where Russell expressed an immediate need for ammunition for a firearm in his possession.  The agent's voice identification, combined with a subsequent law enforcement stop of Russell and his co-defendant, sufficiently corroborated that Russell and his co-defendant were looking for ammunition for a firearm.  Second, the government presented video footage of Russell's involvement in an attempted murder identified in the indictment, and provided evidence that Russell was the getaway driver of the vehicle that appeared in the video, based on a witness identification and that the vehicle was likely one registered to Russell.  While the identity of the witness of the shooting is unknown at this time, and the video does not clearly depict Russell or the vehicle license plate, for purposes of the detention hearing, the Court found the information presented through Special Agent Daou to be both reliable and credible.  This evidence demonstrate

Russell's involvement in violent criminal activity, and weighs towards a finding that Russell poses a danger to the community if released.

### B.      The weight of the evidence against Russell

In general, the weight of the evidence factor is the least important of the various factors to be considered because of the presumption of innocence afforded to criminal defendants prior to trial. *United States v. Radick*, No. 05 CR 798-2, 2006 WL 436116, at *3 (N.D. Ill. Feb. 17, 2006). With that in mind, the evidence against Russell does appear to be strong. Cooperating witnesses, who are members of the Wicked Town Enterprise, have identified Russell as one of the leaders of the organization and involved in an attempted murder. Wiretap evidence places Russell at the center of the Wicked Town Enterprises' activities. His past narcotics convictions in the area controlled by Wicked Town corroborate his involvement in narcotics trafficking as alleged in the indictment. The Court considers that these facts weigh, albeit minimally, in favor of a finding that Russell poses a danger if released. The Court also considers that this factor demonstrates a heighted risk that Russell may flee given the serious nature of the charges lodged against him, the statutory maximum penalty he faces, and the significant evidence gathered by the prosecutor.

### C.      Russell's history and characteristics

In analyzing this factor, the Court must consider the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether he was subject to any other criminal justice supervision at the time of the charged offense. 18 U.S.C. § 3142(g)(3); *Radick*, 2006 WL 436116, at *2. Russell is a 44-year-old man who has lived his entire life in Chicago and who does not possess a passport. He has nine children and has family support from

his mother and sister, almost all of whom reside in this district. Russell has a GED, and prior to the pandemic, he worked as a medical transport driver, although he is currently unemployed. Furthermore, Russell receives disability payments because he suffers from several medical issues and has had two kidney transplants. As a result of the transplants, he must receive a daily injection. Russell also has a bullet lodged in his spine that affects his mobility, and Russell was confined to a wheelchair for several years after he was shot.

Russell's significant ties to the Northern District of Illinois, lack of a passport and prior international travel, and his current medical issues that require continuous care result in a minimal risk of flight. Ms. Jackson's willingness to serve as a third-party custodian and provide a residence for him, along with location monitoring are also conditions that could mitigate any risk of flight. His criminal history demonstrates that despite several bond forfeitures, he has appeared for and served sentences of incarceration in Illinois without any flight from prosecution or incarceration.

However, Russell's prior convictions weigh towards detention as they demonstrate that if released, he poses a significant risk of reengaging in criminal activity. On the one hand, as recounted by Russell's counsel, Russell has a number of minor convictions on his record that date back to his teenage years. However, that is not the entirety of his criminal history. The most concerning of his convictions are those involving narcotics trafficking and firearms as an adult. His September 29, 2000 conviction for narcotics trafficking, combined with his April 5, 2010 convictions for possession of heroin and other narcotics, demonstrate repeated conduct in narcotics-related offenses, which are by their very nature, inherently dangerous to the orderly operation of a civilized society. His two firearms convictions, one on May 13, 2004 and the other on April 3, 2018, demonstrate that this defendant, despite being a convicted felon, continues to obtain and possess dangerous weapons. His arrest on May 26, 2009 for possession of a controlled

substance, despite being on bond as a result of an April 23, 2009 arrest, demonstrates that prior conditions of release did not deter Russell from engaging in additional criminal conduct. While the Court has certainly seen more lengthy and serious recitations of criminal history, Russell's demonstrated pattern of repeated criminal activity provides this Court will little confidence that Russell will abide by any conditions of release and not seek to reengage in conduct for which he has been convicted on multiple occasions.

### D. The nature and seriousness of the danger posed by release

The seriousness of the danger to the community posed Russell's release is significant. The nature of the charges against Russell, as the leader of an organized criminal enterprise, involve acts of murder, and robbery, trafficking of controlled substances, and the possession and trafficking of firearms, all of which are serious criminal offenses. Russell's criminal history involving weapon and drug charges depict a concerning history of illicit activity, consistent with allegations that he is involved in the Wicked Town Enterprise. Russell is alleged to have participated in an attempted murder, and while he continues to be innocent of those charges until proven guilty, the evidence provided to the Court of that shooting is concerning. His involvement in criminal activity appears to have not ceased. As recently as October 29, 2021, during Russell's arrest, federal agents discovered a bag with over 50 grams of a substance suspected to be crack cocaine and scales and baggies in Russell's room, demonstrating present trafficking in narcotics. Additionally, in 2017 law enforcement seized firearms, ammunition, and five bags of suspected heroin from Russell's residence.[1] Thus, his engagement in firearms and narcotics offenses appear

---

[1] The Court recognizes that this information is based on a Chicago Police report, see Doc. [346], and that the Seventh Circuit has stated that "[p]olice reports are not presumed to be categorically reliable." *Jordan*, 742 F.3d at 280. The Court takes this into consideration in weighing this evidence, but is also mindful that the search of his premises did lead to Russell's conviction for a firearms offense.

recent, continuous, and pervasive.  All the above establish a clear and imminent risk that Russell will pose a danger to others if released.

## Conclusion

This Court finds that the government has not met its burden of proof by preponderance of evidence on flight risk.  While there is some risk of nonappearance as a result of the serious charges lodged against Russell, the weight of the evidence, and some history of bond forfeitures, the risk is not substantial and Russell's counsel has proposed conditions that could mitigate those risks, such as location monitoring and a third-party custodian, given the strength and length of his ties to this district, and when considering his medical condition.  Nevertheless, the government has met its burden of proof, for the above reasons, by clear and convincing evidence that there no conditions that will reasonably assure the safety of the community with defendant's release.  The serious nature of the charged offense, his prior convictions for narcotics and firearms offenses, and the evidence presented that demonstrates a continuous desire to obtain firearms and engage in narcotics trafficking all result in the Court finding that there are no conditions by which Russell could be released that could secure the safety of the community.  Accordingly, the Court orders the defendant remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility must deliver the defendant to a United States

Marshal for the purpose of an appearance in connection with a court proceeding. The government's motion for pretrial detention is granted.

**SO ORDERED.**

Dated: November 22, 2021

_____
Sunil R. Harjani
United States Magistrate Judge